## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VALORIE H. JACQUET, )
)
Plaintiff, )
)
v. ) Civil Action No. 10-933-SLR-CJB
)
CAROLYN W. COLVIN, )
Commissioner of Social Security, )
)
Defendant. )
)

### REPORT AND RECOMMENDATION

Plaintiff Valorie H. Jacquet ("Jacquet" or "Plaintiff") appeals from a decision of Carolyn

W. Colvin, the Commissioner of Social Security ("Commissioner" or "Defendant"), denying her

application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 401-434.[1]  The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Jacquet and the Commissioner. (D.I. 13, 17)  Jacquet asks the Court to direct that she be

awarded benefits, or in the alternative, remand for further proceedings. (D.I. 14 at 23)  The

Commissioner opposes this motion and requests that the Court affirm the decision. (D.I. 19 at

36)  For the reasons set forth below, the Court recommends that Jacquet's motion for summary

---

[1]     Carolyn W. Colvin became the Commissioner of Social Security on February 13,
2013, after this proceeding was initially filed.  Pursuant to Rule 25(d) of the Federal Rules of
Civil Procedure, Ms. Colvin replaced the previous Commissioner, Michael J. Astrue, as the
defendant in this case. *Malcom v. Colvin*, Civ. No. 12-584-SLR, 2013 WL 5365339, at *1 n.1
(D. Del. Sept. 25, 2013).

judgment be GRANTED-IN-PART and DENIED-IN-PART, that the Commissioner's motion for summary judgment be DENIED, and that the case be remanded for limited further proceedings as is described in this Report and Recommendation.

## I.    BACKGROUND

### A.    Procedural History

Jacquet filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on November 23, 2004, alleging disability beginning on August 1, 2004. (D.I. 11 ("Transcript" and hereinafter "Tr.") at 85–87, 549; D.I. 14 at 1; D.I. 19 at 1) On June 15, 2005, Jacquet's application was denied. (Tr. at 34–38) On August 8, 2005, Jacquet filed a request for reconsideration, and on September 26, 2005, the application was once again denied. (Tr. at 39–45) Jacquet then filed a request for a hearing (the "first hearing") before an Administrative Law Judge ("ALJ") on October 21, 2005. (Tr. at 46) The first hearing was held on April 4, 2007. (Tr. at 470) On August 16, 2007, the ALJ issued a partially favorable decision (the "first decision"), concluding that Jacquet was not disabled prior to September 22, 2006, but became disabled on that date (the date of Jacquet's 50th birthday).[2] (Tr. at 13-31; D.I. 19 at 1) Jacquet then requested review by the Appeals Council of the unfavorable portion of the first decision (Tr. at 11), which was denied by the Appeals Council on November 10, 2008. (Tr. at 5–7)

On December 16, 2008, Jacquet filed a Complaint in this Court to challenge the

---

[2]    The finding that Jacquet was disabled as of the date of her 50th birthday was directed by Medical-Vocational Guideline 201.14, which dictates that an individual with no transferable skills who is limited to sedentary work must be found disabled when she attains the age of 50. 20 C.F.R. pt. 404, subpt. P, app. 2; (D.I. 14 at 5; D.I. 19 at 1 n.1).

unfavorable portion of the first decision. (Tr. at 589) On July 16, 2009, the Commissioner filed a unopposed motion to remand the proceedings to refer Jacquet's case to an ALJ for further evaluation; the motion was granted on July 21, 2009. (Tr. at 583, 590-593) Thereafter, the Appeals Council ordered that on remand, the ALJ should, *inter alia*: (1) address the impact certain manipulative limitations cited by Dr. Michael Mark, a neurologist, would have on the ALJ's decision; (2) further evaluate Jacquet's mental and musculoskeletal impairments; (3) explicitly assess the credibility of two witnesses who testified at the first administrative hearing; and (4) address how the her finding that Jacquet could perform certain kinds of sedentary work could co-exist with her finding that Jacquet could work as a security guard, which is typically classified as a light work occupation. (Tr. at 586-87)

On June 25, 2010, the ALJ held another hearing (the "second hearing") pursuant to the order of the Appeals Council. (Tr. at 623-46) On July 17, 2010, the ALJ issued an unfavorable decision (the "second decision"), finding that Jacquet was not disabled for the period of August 1, 2004 through September 21, 2006. (Tr. at 546-73)

On November 1, 2010, Jacquet filed a Complaint in this Court seeking judicial review of the ALJ's second decision. (D.I. 2) On July 26, 2011, Jacquet filed her motion for summary judgment. (D.I. 13) The Commissioner opposed Jacquet's motion, and filed a cross-motion for summary judgment on September 26, 2011. (D.I. 17) On March 30, 2012, Judge Sue L. Robinson referred this case to the Court to conduct all proceedings and to hear and determine all motions. (D.I. 22)

### B.    Factual Background

At the time of the first hearing in 2007, Jacquet was 50 years old. (Tr. at 481) She has a

3

twelfth grade education, (Tr. at 100), and last worked on or about September 15, 2004, when she was a cook and supervisor at Dover Healthcare Associates, (Tr. at 96, 483).

### 1.    Plaintiff's Medical History, Treatment, and Condition

Jacquet alleged that she became disabled on August 1, 2004 and has been disabled thereafter. (Tr. at 46, 95-96) Thus, the relevant period of alleged disability at issue is from August 1, 2004 to September 21, 2006 (the date on which the Commissioner otherwise found Jacquet to be disabled). (Tr. at 549–72; D.I. 19 at 5)

### a.    Physical Medical History in 2004

Between August of 2004 and August of 2005, Jacquet visited Dr. Sandeep Mann, M.D., her primary care physician. (Tr. 259–91, 316) Dr. Mann noted after a visit on August 9, 2004 that Jacquet complained of pain in her feet that was "severe at times." (Tr. at 289-90) Dr. Mann also noted that Jacquet had tenderness in both feet but no swelling, tenderness, effusion, or deformity in her joints or spine. (Tr. at 290) As he would in each of Jacquet's visits into early 2005, Dr. Mann noted that Jacquet's gait was "[n]ormal[,]" that he counseled Jacquet on her smoking, instructed her to exercise by walking two miles three to five times a week, and discussed whether she should join a weight reduction program in order to address her obesity. (Tr. at 277-79, 282-83, 287-88, 290-91)

On August 13, 2004, Jacquet visited Dr. Brett A. Chicko, DPM. (Tr. at 198–99) Dr. Chicko noted after this visit that Jacquet has an advanced form of pes planus valgus, which Dr. Chicko believed was leading to some of her symptoms of burning, numbness, and pain in her toes. (Tr. at 198) Dr. Chicko also noted that Jacquet showed signs of nerve entrapment, for which he gave various injections; Jacquet reported that this did not stop all of the pain, and Dr.

4

Chicko noted that Jacquet was still altering her gait. (Tr. at 199)  On August 19, 2004, Jacquet

returned to Dr. Chicko's office, reporting that she was feeling a little better and that orthotics Dr.

Chicko recommended had helped, but that she still felt like she was "walking on crushed

rocks[.]" (Tr. at 197)  Dr. Chicko also noted the presence of degenerative joint disease mid-foot

and heel pain syndrome bilaterally.  (*Id.*)

On August 23, 2004, Jacquet visited Dr. Chicko again, reporting bad foot pain bilaterally

and claiming that the pain was becoming worse. (Tr. at 197)  Dr. Chicko noted that prior heel

pain syndrome was almost resolved, and that the type of pain at issue seemed to be neuropathy.

(*Id.*)  He prescribed Neurontin 300 mg once daily, and scheduled an appointment for Jacquet

with neurologist Janine Islam, M.D., for a nerve conduction velocity test and EMG.  (*Id.*)

Jacquet returned to Dr. Mann's office on August 25, 2004, where her foot-related symptoms

were similar to her prior visit. (Tr. at 285-88)  Dr. Mann also educated Jacquet about diabetes.

(Tr. at 287–88)

On September 7, 2004, Jacquet visited Dr. Islam for the first time, and reported a

numbness and burning in her feet. (Tr. at 311)  Jacquet's gait was antalgic with no focal

weakness.  (*Id.*)  Dr. Islam found that Jacquet was experiencing peripheral sensorimotor

neuropathy, noting that although an EMG could not discern the cause, that this was the type of

neuropathy most commonly seen with diabetes. (Tr. at 313)

On September 10, 2004, Jacquet returned to Dr. Chicko  (Tr. at 196)  She relayed that she

was a confirmed diabetic and that her pain due to neuropathy had improved but had not yet

resolved.  (*Id.*)  Dr. Chicko increased Jacquet's dosage of Neurontin to four tablets per day.  (*Id.*)

In a later October 7, 2004 visit, Jacquet claimed bilateral foot pain even while taking seven

5

tablets of Neurontin a day. (Tr. at 195) Jacquet further reported that the Neurontin made her lightheaded and that she was having trouble at work. (*Id.*) Dr. Chicko instructed Jacquet to continue this dosage of Neurontin and prescribed Percocet. (*Id.*)

Jacquet returned to Dr. Chicko's office a week later on October 14, 2004, explaining that she was having trouble walking or driving at certain times in the day. (Tr. at 195) She said that the Neurontin was "making her vision blurry" and that even in taking it, "she is still having discomfort walking and she cannot perform a full day of work." (*Id.*) Dr. Chicko noted diabetic peripheral, sensory, and motor neuropathy bilaterally, and reported that, [a]t this point I do not believe that the patient is able to perform her duties at work to a proper level." (*Id.*) He explained to Jacquet that her symptoms would stabilize once she was able to control her blood sugar; he also noted that patients often grow accustomed to Neurontin, at which point the blurry vision and lightheadedness pass. (*Id.*)

On October 19, 2004, Jacquet returned to Dr. Chicko, stating that the pain in her feet was increasing. (Tr. at 194) She reported taking between seven and nine Neurontin a day, which she did not believe was helping the pain, although she thought that the Percocet was helping. (*Id.*) Dr. Chicko wrote prescriptions for Oxycontin 10 mg and Percocet. (*Id.*)

On November 23, 2004, Jacquet again visited Dr. Chicko, complaining of pain and reporting that eight Neurontin a day, Oxycontin and Percocet did help the pain, but caused lightheadedness. (*Id.* at 193) Dr. Chicko instructed, *inter alia*, that Jacquet continue with the medication and follow up with her neurologist. (*Id.*)

On November 30, 2004, Jacquet visited Dr. Islam. (Tr. at 308) Dr. Islam described Jacquet's gait as "abnormal, as it is antalgic and step-to." (Tr. at 309) Her impressions were that

6

Jacquet's foot pain was due to peripheral neuropathy, likely from Jacquet's diabetes, and that low back pain Jacquet was experiencing was likely musculoskeletal. (*Id.*) Dr. Islam took a number of steps, including giving Jacquet a prescription for amitriptyline, referring her to physical therapy for gait training and other foot therapy, and referring her to "vocational rehabilitation . . . [and] for a job training and placement into a sedentary duty job so she can stay off her feet." (Tr. at 309-10)

On December 22, 2004, a medical consultant for the Division of Vocational Rehabilitation, Charles Allen, M.D., filed a recommendation form addressing Jacquet's prognosis and ability to work based on symptoms from peripheral neuropathy due to diabetes. (Tr. at 412) Dr. Allen wrote that Jacquet was in a "[b]ad situation" and that she needed to lose weight but could not walk or exercise due to her neuropathy. (*Id.*) He further noted that Jacquet should apply for SSDI, as it would be "[h]ard to place" her in a job if she is "on narcotics regularly" and that her neuropathy would likely progress. (*Id.*) Dr. Allen noted: "[n]eeds sedentary job—off of narcotics!" (*Id.*)

On December 29, 2004, Jacquet returned to Dr. Islam. (Tr. at 306) Jacquet reported that she was unchanged and that her feet go from being numb to being in pain on a daily basis. (*Id.*) Jacquet's gait was noted to be "antalgic and slow, but [with] no focal weakness." (*Id.*) Dr. Islam noted that disability forms were filled out for Jacquet, that her low back pain was currently resolved, and that she had also added a prescription for Paxil 20 mg, which she noted would be "not just for depression, but for foot pain." (Tr. at 306-07)

Jacquet also returned to Dr. Mann's office on December 29, 2004. (Tr. at 281–284) Notes from this visit remained largely similar to notes from prior visits. However, Dr. Mann

7

now noted that Jacquet had neuropathy in her feet, that she was seeing a pain specialist and podiatrist, and that she had joined vocational rehabilitation. (*Id.*)

###### b.  Physical Medical History in 2005

On January 27, 2005, Jacquet returned to Dr. Islam's office, claiming that she was essentially unchanged and that she had a burning type of pain in her feet at night, though in the day it was "not so bad." (Tr. at 304)  Jacquet reported, *inter alia*, that the pain medications were helpful but that they wear off, and that she had just begun physical therapy. (*Id.*)  Dr. Islam noted that Jacquet's gait was stable with her arches markedly flattened with weight bearing. (*Id.*)  Dr. Islam switched Jacquet off of some of her pain pills to the Duragesic Patch 25 mcg, which would provide a constant level of pain relief. (Tr. at 305)

On February 9, 2005, Sonia Songui, Jacquet's vocational counselor, completed paperwork indicating that Jacquet had significant impediments to employment, and that it was unclear whether she would be able to obtain employment after vocational rehabilitation. (Tr. at 132)  Ms. Songui reported that Jacquet could not sit or stand for more than three hours, that she was below the fifth grade level in reading, spelling or math, and placed herself at risk due to poor decision making. (Tr. at 133)

Jacquet again visited Dr. Islam on February 24, 2005, stating that she felt somewhat better but still had pain almost every day in both her feet, some back pain, and reported a "new complaint" of swelling and pain in her knees. (Tr. at 302)  Dr. Islam's impressions included foot pain from peripheral neuropathy, likely from diabetes, as well as bilateral knee pain and low back pain, both likely due to osteoarthritis. (*Id.*)

On March 3, 2005, Jacquet visited both Dr. Islam and Dr. Mann, reporting foot pain, knee

8

pain and that her legs were swollen. (Tr. at 278-79, 300)

On March 24, 2005, Jacquet visited Dr. Islam, reporting that she was "feeling better." (Tr. at 298) Jacquet's gait was normal, and she reported that her right knee only hurt when bent, her lower extremity edema had resolved, her foot pain was very manageable with her current dosage of medication, and that her back pain had gotten better. (*Id.*) Dr. Islam reviewed x-rays taken of Jacquet's lower back and knees, reporting that the x-ray of the lower back showed early degenerative disc disease, facet arthopathy with spondylolisthesis at L4-L5 and 6 mm of reverse spondylolisthesis at L5-S1. (*Id.*) Dr. Islam also reported that the x-rays of the knees showed osteoporosis and degenerative change in both knees and joint effusion in the right knee. (*Id.*)

On March 31, 2005, Jacquet returned to see Dr. Mann, who noted Jacquet's knee pain, although he wrote that there was no swelling, tenderness, or effusion in her joints. (Tr. at 273–74) He also noted that the swelling in her legs had resolved. (Tr. at 274)

On April 6, 2005, Jacquet visited the office of Richard DuShuttle, M.D., P.A. for an initial evaluation. (Tr. at 251) Jacquet reported pain in both of her knees, particularly the right, and claimed to have difficulty getting up from a seated position. (*Id.*) Dr. DuShuttle noted that x-rays taken of her right knee on April 1, 2005 showed degenerative changes but no other abnormalities. (*Id.*) Dr. DuShuttle aspirated Jacquet's knee, which yielded 70 cc's of fluid and provided Jacquet relief. (Tr. at 252) He diagnosed the problem as "right knee strain/chondromalacia[,]" and prescribed Voltaren 75 mg. (*Id.*) Handwritten notes indicate that Jacquet later called the office on April 11 and April 20, 2005, requesting pain medication, which was prescribed. (*Id.*)

On April 19, 2005, Jacquet returned to Dr. Islam's office, reporting acute worsening of

9

the pain in her feet. (Tr. at 296) Dr. Islam noted that Jacquet was anxious, that her gait was abnormal and very antalgic with both feet, and that she transferred from sitting to standing by pushing up on her chair. (*Id.*) She further noted that Jacquet's feet showed cyanosis, edema, and erythema and that the right knee was somewhat swollen. (*Id.*) On the next day, April 20, 2005, Jacquet reported to Dr. Mann that the pain in her right knee was worse and tender after seeing Dr. Dushuttle. (Tr. at 269-70) However, Dr. Mann further noted that Jacquet otherwise reported that she was feeling better, and that her leg swelling was down. (*Id.*) And on April 27, 2005, Jacquet returned to Dr. DuShuttle's office for re-evaluation and stated that her right knee was doing "much better." (Tr. at 250) Dr. DuShuttle noted that there was full flexion and extension with minimal stiffness and no effusion, instability, medial or lateral jointline tenderness, or neuro or sensory deficits. (*Id.*) He explained to Jacquet that she should "avoid repetitive kneeling, squatting and stairs." (*Id.*)

In May 2005, Jacquet was examined by two state agency physicians. (Tr. at 223–31) On May 17, 2005, Michael Borek, D.O., conducted a residual functional capacity ("RFC") assessment for Jacquet. (Tr. at 223–29, 568) Dr. Borek found that Jacquet's maximum RFC was for sedentary work, and afforded controlling weight to Dr. Islam's November 30, 2004 opinion that Jacquet could perform that type of work. (Tr. at 230, 308–10; D.I. 19 at 9) Anne Aldridge, M.D. agreed with these findings on September 23, 2005. (Tr. at 230, 568)

On June 2, 2005, Jacquet again visited Dr. DuShuttle's office, reporting right knee pain and swelling and also indicating that the pain medications did not help. (Tr. at 249) A physician's assistant noted swelling to the knee, and reviewed the MRI of Jacquet's knee that was taken in April 2005, which showed a medial meniscal tear and severe osteoarthritis in the

10

right knee. (*Id.*; D.I. 19 at 9) He explained that Jacquet would need an arthroscopy on the right knee, aspirated 40 cc's of clear fluid from that knee (after which Jacquet felt relief) and prescribed Darvocet-N 100 No. 40. (Tr. at 249) On June 20, 2005 and August 3, 2005, Dr. Mann noted Jacquet's recent medical visits, her continued reports of foot numbness and pain, tenderness in her right knee, that she had occasional leg swelling, and that her gait was normal. (Tr. at 259-64)

On August 4, 2005, Jacquet visited Dr. Islam's office, reporting that she was unchanged and "happy" with the level of pain relief. (Tr. at 294) Jacquet further informed Dr. Islam that she had canceled her arthroscopic knee surgery with Dr. DuShuttle because he had told her that she would need a knee replacement and she did not want to have two surgeries. (*Id.*) Jacquet rated her pain as a 3–4 on a scale of 10 on medication and rated her pain without medication as a 10. (*Id.*) Dr. Islam noted that Jacquet's gait was antalgic without focal weakness. (Tr. at 295)

Jacquet returned to Dr. Islam on August 31, 2005, stating that she was unchanged but satisfied with the level of pain relief and therefore content. (Tr. at 292) Dr. Islam noted that her gait was "improved from her last visit but [was] still slightly antalgic and stiff" and that she could transfer sit-to-stand and stand-to-sit smoothly and easily. (*Id.*)

On a September 29, 2005 visit, Dr. Islam noted that Jacquet was unchanged with daily pain in her feet and back, and that her gait was slow and antalgic with no focal weaknesses. (Tr. at 391) Just as she had in November 2004, Dr. Islam wrote that Jacquet "will need to obtain a sedentary duty job[.]" (*Id.*) She wrote that she had called the Division for Vocational Rehabilitation, that she had set Jacquet up for training classes at the Delaware Department of Labor and that she inquired about classes for Jacquet in January 2006 "for retail management[.]"

11

(Tr. at 391–92) Dr. Islam further noted that Jacquet would no longer be able to afford the Duragesic Patch, and that she would be switched to methadone. (*Id.*)

On October 26, 2005, Jacquet visited Dr. Islam, stating that her pain was worse off the patches and that the pain was in her back, but mainly in her legs, and feet. (Tr. at 389) Dr. Islam noted that Jacquet's gait was slow and somewhat antalgic, although there was no focal weakness, that she could transfer independently, and that there was trace edema of the feet. (Tr. at 390) She reported that Jacquet had not shown up for a prior vocational rehabilitation appointment. (Tr. at 389)

On December 1, 2005, Jacquet visited Dr. Islam, stating that her feet were bothering her "a lot" and that she was out of methadone and other pain medication. (Tr. at 387) Dr. Islam noted that Jacquet's gait was somewhat antalgic and, *inter alia*, left a message for a vocational rehabilitation specialist. (Tr. at 387–88) Dr. Islam also filled out a Specialist Examination and Report form, in which she concluded that Jacquet could not "stand or walk for prolonged periods of time[.]" (Tr. at 409) Dr. Islam further noted the following functional or environmental restrictions: that Jacquet was limited to sitting for up to eight hours a day, standing for up to two hours per day, walking up to two blocks, climbing no more than two flights of stairs and had no reaching, stooping or temperature/humidity-related restrictions. (Tr. at 410)

On December 28, 2005, Jacquet reported to Dr. Islam that she was feeling worse, with a burning type pain in her feet and numbness on the bottom of her feet. (Tr. at 385) Dr. Islam noted that Jacquet's gait was somewhat antalgic without focal weakness and that her leg showed trace edema in bilateral lower extremities without warmth or erythema. (Tr. at 386) Dr. Islam adjusted Jacquet's medication and instructed her to attend physical therapy for gait speed, hip

12

and knee strengthening, and foot and toe stretching and strengthening. (*Id.*)

### c. Physical Medical History in 2006 and 2007

On January 26, 2006, Jacquet reported to Dr. Islam that she was unchanged and had pain every day in her back and feet. (Tr. at 383) Dr. Islam noted that Jacquet's mood was tearful and anxious at times, and that her gait was somewhat antalgic with no focal weakness. (Tr. at 384) Jacquet was instructed to keep the current dose of the Duragesic Patch and to try Cymbalta for the neuropathic pain as well as for mood. (*Id.*) Dr. Islam noted that she looked into enrolling Jacquet in a computer training program, and instructed Jacquet to continue the physical therapy, which Jacquet had reported was helpful and enjoyable. (Tr. at 383-84)

On February 21, 2006, Jacquet reported to Dr. Islam that she was "feeling better" and was "happy" with the physical therapy and the Cymbalta. (Tr. at 381) Dr. Islam noted that Jacquet's gait was normal, her affect was pleasant, and that she should continue with the current medications. (Tr. at 382)

On March 14, 2006, Dr. Allen again filled out a form for the Division of Vocational Rehabilitation. Again he wrote that Jacquet needed a "sedentary job" that was "off narcotics[,]" that she needed to lose weight, and that her neuropathy would progress as long as her diabetes was poorly controlled. (Tr. at 411 (emphasis removed))

On March 21, 2006, Jacquet visited Dr. Islam, stating that she was unchanged, and that her daily foot and back pain was "very bearable" with medication. (Tr. at 378) Dr. Islam further noted that Jacquet's affect was pleasant, that her gait was somewhat stiff with no focal weakness and that she could transfer with some stiffness but without assistance. (Tr. at 379)

On March 27, 2006, Jacquet visited Joel Rutenberg, M.D., another doctor at Dr. Islam's

13

practice, for the first time. (Tr. at 374) At this appointment, Jacquet summarized the pain she
felt over the last few years. (Tr. at 375-76) Dr. Rutenberg's assessment noted that Jacquet had
numbness in her feet, that her history suggested she could have restless leg syndrome, and that
she had plantar pain with weight bearing that could be caused by either plantar fasciitis or a rare
side effect of statins. (Tr. at 376-77) Dr. Rutenberg also noted that Jacquet had a history of
memory problems and blurred vision that could be attributed to her medication. (Tr. at 377)

On April 19, 2006, Jacquet visited Dr. Islam for the last time, as Dr. Islam was leaving
the practice. (Tr. at 370-71) Jacquet reported to Dr. Islam that she was unchanged and had pain
mostly in her feet. (Tr. at 370) Dr. Islam noted that Jacquet's gait was somewhat slow with no
focal weakness, that she could transfer sit to stand without difficulty, and that her heel and toe
walk were normal. (Tr. at 371) Dr. Islam instructed, *inter alia*, that Jacquet should continue the
Duragesic Patch and Percocet for the severe pain. (*Id.*)

On May 10, 2006, Jacquet returned to Dr. Rutenberg, complaining of numbness in her
feet and her lower legs. (Tr. at 368) Dr. Rutenberg noted that Jacquet probably had peripheral
polyneuropathy, may have minimal restless leg syndrome and had also had more lumbar pain
recently, which had been radicular, particularly in the right leg. (*Id.*) On May 17, 2006, John
Coll, DO interpreted the results of an MRI of the lumbar spine, reporting that, at L4-5, there was
diffuse disk protrusion and moderate facet hypertrophy, as well as mild, bilateral nerve root canal
stenosis and mild lumbar stenosis. (Tr. at 366) At L5-S1, Dr. Coll noted that there was diffuse
disk protrusion and mild-moderate facet hypertrophy, as well as mild left nerve root canal
stenosis. (Tr. at 366–67) At T11-12, Dr. Coll noted mild degenerative disk changes and
posterior disk bulge. (Tr. at 367)

14

On August 2, 2006, Jacquet returned to Dr. Rutenberg's office, reporting continued numbness in her hands and feet, which was worse at night. (Tr. at 360)  Jacquet expressed that she felt she needed to move her legs to get comfortable, and that she had experienced increased lumbar pain, which occasionally radiated to the right leg. (*Id.*)  Dr. Rutenberg reported that in the office, Jacquet seemed to move her legs spontaneously, although she said the pain was worse at night. (Tr. at 361)

On October 2, 2006, Dr. Mann completed a Physician's Statement in which he concluded that Jacquet was "unable to sustain any kind of work on a regular, everyday 40/hr per week basis." (Tr. at 317)  In April 2007, Dr. Mann wrote a further short letter in which he opined that Jacquet was "unable to work full time due to the effects of [] chronic pain medication" that caused sedation. (Tr. at 438)

On June 1, 2007, Dr. Mark, a state agency neurologist, examined Jacquet and completed a Disability Determinations Evaluation. (Tr. at 439-40)  Dr. Mark's impression was that Jacquet had "severe diabetic polyneuropathy with pain even on light touch" and "low back pain without evidence of radiculopathy." (*Id.* at 440)  Based on the examination, Dr. Mark also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" wherein he indicated that Jacquet: (1) could occasionally lift and occasionally carry up to ten pounds but could never lift and never carry in excess of ten pounds; (2) could sit for up to four hours at a time and both stand and walk for up to one hour at a time without interruption; and (3) could sit for up to eight hours total in an eight-hour work day, and both stand and walk for up to two hours total in an eight-hour work day. (Tr. at 441-42)  With respect to the use of her right and left hands, Dr. Mark indicated that Jacquet could frequently perform handling activities and all

15

reaching except overhead reaching, could occasionally perform fingering, push/pull, and

overhead reaching activities, and could never perform feeling activities. (Tr. at 443) Dr. Mark

noted that Jacquet did not require the use of a cane to ambulate, but could never operate foot

controls. (Tr. at 442-43) He opined that Jacquet could occasionally climb stairs and ramps but

could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl, and that Jacquet

could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, and

humidity and wetness, but could never tolerate exposure to unprotected heights, dust, odors,

fumes, and pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. at 444-45)

### d.      Mental Medical History

On January 31, 2005, Frederick W. Kurz, Ph.D. conducted a psychological evaluation of

Jacquet for the purpose of assisting in vocational planning. (Tr. at 203) For Jacquet's mental

status examination, Dr. Kurz noted that Jacquet's language skills, mood, and affect were

appropriate for the situation and noted no evidence of depression or anxiety. (Tr. at 204) Dr.

Kurz further found that Jacquet had "adequate" attention, pace, registration and memory skills.

(*Id.*) He reported that Jacquet's testing scores placed her within low average to borderline levels

of intelligence. (*Id.*) Dr. Kurz explained that the differences among Jacquet's test scores

indicated that Jacquet generally processes, stores, and retrieves verbal information significantly

better than she does non-verbal information. (*Id.*) On another test, Jacquet's academic abilities

fell either at or below the level of a high school graduate, and she had problems particularly with

spelling and arithmetic, areas in which she was functioning at the middle school level. (Tr. at

205)

Dr. Kurz concluded that Jacquet had cognitive disorder-NOS, arithmetic disorder and

16

learning disorder-NOS, and that her Global Assessment of Functioning ("GAF") was a 65.  (Tr. at 207)  He further noted that: (1) Jacquet should avoid occupations that required significant perceptual-motor skills; (2) she had expressed interest in becoming a medical transcriptionist, but the occupation did not seem a viable option due to her limited spelling skills and the pain she reported in her right hand and fingers; (3) she had the verbal and sight-reading skills to function as a clerk or telephone solicitor; (4) that while she had expressed a "sincere desire to obtain employment[,]" her medical conditions suggested that "prognosis for a successful vocational outcome [was] guarded."  (*Id.*)

Jacquet also visited F.H. Everett & Associates, Inc. in Dover Delaware on February 6, 2006, where she was examined by therapist Diana Cohen, LCSW.  (Tr. 321–25)  Cohen noted that Jacquet was friendly, had a spontaneous manner, and had normal motor activity.  (*Id.* at 322) In terms of Jacquet's speech, Cohen noted that it was coherent, relevant, and had spontaneous productivity.  (*Id.*)  Cohen noted that Jacquet's affective status was in constricted range, that Jacquet reported being depressed, and that her affect was depressed and anxious.  (*Id.*) Regarding Jacquet's cognitive status, Cohen noted that she was alert and oriented, had intact attention and memory, had adequate concentration, and average intelligence.  (Tr. at 323)  Cohen further noted that Jacquet's common sense, impulse control, judgment in regard to the chief complaint, and intellectual and emotional insight were all fair.  (*Id.*)  Cohen noted that Jacquet's assets were that she is motivated and cooperative and that her weaknesses included procrastination, decreasing concentration, and that she is emotional.  (*Id.*)  Cohen diagnosed Jacquet with a major depressive disorder and panic disorder.  (Tr. at 324; D.I. 19 at 15)  Cohen also gave Jacquet a GAF rating of 50.  (Tr. at 324)

17

On June 2, 2007, Joseph Keyes, Ph.D., a state agency psychologist, examined Jacquet to assist in a disability determination. (Tr. at 448) Dr. Keyes's diagnostic impression was that Jacquet had a "[m]ood disorder with depressive features due to peripheral neuropathy and chronic pain" and a "learning disorder (nonverbal-base) not otherwise specified." (Tr. at 451-52) Based on the examination, Dr. Keyes also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." In that document, he indicated that Jacquet's impairment: (1) created no restrictions in her ability to "[u]nderstand and remember simple instructions[,]" "[c]arry out simple instructions[,]" and "[m]ake judgements on simple work-related decisions[,]" and (2) created only mild restrictions in her ability to "[u]nderstand and remember complex instructions[,]" "[c]arry out complex instructions[,]" and "[m]ake judgments on complex work-related decisions." (Tr. at 453) Dr. Keyes found that Jacquet had (1) mild restrictions in her ability to "[i]nteract appropriately with the public," "[i]nteract appropriately with supervisor(s),"and "[i]nteract appropriately with co-workers," but (2) no restrictions her ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. at 454)

## 2. The First Administrative Hearing

### a. Jacquet's Testimony

At the first administrative hearing, the ALJ began by examining Jacquet. Jacquet said that she had a driver's license and was able to drive. (Tr. at 482) She was able to read, write, and do simple math and had a high school degree. (*Id.*)

In regard to her work history, Jacquet said that she worked at Dover Healthcare Associates as a diet aid and cook from 1993 to 2005. (Tr. at 483) She testified that, in these

18

positions, she would spend the entire eight-hour day standing and walking, and that she would lift up to fifty pounds as a dietary aide and over 200 pounds over the course of the day as a cook. (Tr. at 483–84) Jacquet testified that at the time she had to leave her position, she was a supervisor and had been for just over a year. (Tr. at 484) Jacquet said that she initially stopped working because of the pain in her feet, and that after she had called out of work for a period of time, she began to see Dr. Chicko, who eventually discovered that she had diabetes. (Tr. at 485) Jacquet said that Dr. Chicko did not tell her to stop working, but eventually she could not work anymore due to the pain. (*Id.*) Jacquet testified that she had not worked for pay since 2004, but that she had received some disability pay from her workplace in 2005. (Tr. at 486)

Jacquet said that her most significant limiting pain was that in her hands and feet, caused by diabetes, pain that she experienced every day. (Tr. at 489) When asked about swelling in her feet, Jacquet testified that she had swelling three or four times a week depending on her activity level and her fluid intake. (Tr. at 496) As to her hand usage, Jacquet acknowledged that she could button a blouse, zip up a jacket, pick up a coin from a table with difficulty, hold a knife and fork to eat, hold a toothbrush, and hold a pen to fill out a job application, although she stated that she could not hold a hair brush for long, as it caused pain. (*Id.* at 489) Jacquet said that she could open a car door or a doorknob, and could hold a car steering wheel. (Tr. at 490) Jacquet testified that she would rate her foot pain an eight to nine with medication, and an "extreme[] ten" without medication. (*Id.*)

Jacquet testified that her next biggest health problem was with her back, noting that she experienced back pain once a day, for which she performs physical therapy. (Tr. at 492–93) She stated that she had spasms and stiffness in her back and that her back pain would be rated an

19

eight on the pain scale with medication. (Tr. at 494) Next in terms of severity was the side effects of Jacquet's pain medication, which included dry mouth, slurred speech, constipation, memory loss, and becoming emotionally upset. (*Id.*) Jacquet also discussed her knee pain, saying that she had pain in her knees every day, which she had attempted to remediate with therapy (but not surgery). (Tr. at 495-96) Jacquet described her knees as looking flat and swollen due to arthritis, and rated her knee pain as a seven or eight with medication on a scale of 10. (Tr. at 496)

Regarding her mental health, Jacquet stated that she was taking Cymbalta and that she believed it or other medication did not help at all with her mental symptoms. (Tr. at 498-99) Jacquet also testified that she had tried to see a mental health professional but she did not feel that the experience was beneficial, believing that she could handle the situation on her own, although she had since realized she could not. (Tr. at 499) Jacquet testified that she would get upset over what she was going through and found it difficult to be around other people. (Tr. at 500)

Jacquet testified that she could stand or walk for minutes, as opposed to hours, and that she could sit in a chair with her pain medication for about an hour before her back would start to bother her. (Tr. at 502) Jacquet further testified that she could lift five pounds, that she could bend at the waist and kneel, but not get up from kneeling, and that she does not even try to stoop to pick something up off of the floor. (Tr. at 502–03) Jacquet also testified that she was limited in her ability to do household chores. (Tr. at 503-06)

When examined by her attorney, Jacquet testified that her memory issues, seemingly caused by her medication, had contributed to problems at her last job (such as her failure to

20

remember things about the diet of residents at the nursing home). (Tr. at 508-09) Jacquet further testified that she had hoped to go back to her job and had participated in vocational rehabilitation, although she experienced many difficulties, such as nodding off due to the effects of her medication while taking job-related tests. (Tr. at 509–13)

Jacquet then further described the pain in her feet. She stated that she felt as though she is stepping on gravel—that her feet are extremely sensitive and often feel as though they were on fire. (Tr. at 514) Jacquet further testified that although her doctors tell her that she needed exercise, she is only able to do so for about ten to fifteen minutes before she is worn out. (Tr. at 517–18) Jacquet testified that since she had gone on medical leave in October of 2004, her walking had gotten worse and she believed that she was walking "funny" because she walks on her heels, the only part of her feet that do not hurt. (Tr. at 521–22) She described how her feet and ankles swell up, explaining how this was exhibited by pictures in the record. (Tr. at 523-25)

### b.    Other Witness Testimony

Jacquet's attorney examined Robert Goode ("Goode"), Jacquet's boyfriend, who testified that he had been in a relationship with Jacquet since 1999. (Tr. at 526) Goode further testified that Jacquet had trouble doing things for herself, including daily chores, due to her pain. (Tr. at 526-27) Goode recalled that Jacquet had told him that she was having problems standing on her feet at work; eventually, she said that her inability to stand on her feet led to the end of her employment in 2004. (Tr. at 528-29) In describing the change in Jacquet's walking from 2004 to 2007, Goode testified that she was limping in 2004, but by 2007, the limp was worse, as Jacquet "wobbles like she's switching her weight from one side of her body to the other to try to absorb [the pain] when she's walking[.]" (Tr. at 529–30) Goode further testified that Jacquet

normally uses her cane, has problems getting out of chairs, and on a typical day usually lays in bed, sleeps, and takes her medication. (Tr. at 530–31)  Goode also testified that Jacquet only goes out in order to attend her appointments and that Jacquet would not be able to work a forty-hour week. (Tr. at 531)

Jacquet's attorney next examined Jacquet's sister, Tracy Castile-Frederick ("Castile-Frederick"). (Tr. at 532)  Castile-Frederick testified that she typically sees Jacquet three times a week, and that Jacquet describes her pain as excruciating. (Tr. at 533)  Castile-Frederick also testified that she had seen Jacquet crying or upset during her visits and opined that Jacquet could not work a full day of work or "sustain daily life" without help. (Tr. at 534)  Castile-Frederick explained that she believed this to be the case because Jacquet cannot get around while she is on her medication and that Jacquet often seems groggy and has slurred speech while taking medication. (Tr. at 534–35)

### c.    Vocational Expert's Testimony

The ALJ then examined the Vocational Expert ("VE"), Jan Howard Reed. (Tr. at 535–538A)  The VE testified that Jacquet's previous occupation as a cook would be a semi-skilled position, the supervisory position would be skilled, and both positions are generally considered to be medium exertion. (Tr. at 536)  The VE further testified that a person in the position of a cook supervisor would have transferable skills, but not ones that would transfer to sedentary positions. (*Id.*)

The ALJ then posed a hypothetical to the VE:

> Now, if we were to consider a hypothetical person who is about the claimant's stated age at onset, that would be 47 years. This person has a high school education, the work history that you just talked about, the certain underlying impairments that place limitations on

22

> the ability to do work related activities. In this hypothetical we'll
> start at a light level of exertion, all the posturals occasional but
> never climb a ladder, rope or a scaffold. Avoid concentrated
> exposure to extreme cold, hazards and vibration. I'm assuming that
> that hypothetical would eliminate that past relevant work. Would
> the light – would the transferable skills moving to a light cooking
> job, would that be, under this hypothetical would that be – would
> such a person be able to do a light cooking job?

(Tr. at 537) The VE responded: "[y]es." (*Id.*)

The ALJ then posed a new question to the VE:

> Now, let's say that such a person instead of being able to have
> transferable skills transfer like that, this person would be limited to
> simple unskilled work due to medication side effects. If that were
> to be the case, would there be any, maybe several at light, several at
> sedentary jobs that would fit within the perimeters of that
> hypothetical such a person could do at the unskilled level?

(Tr. at 537-38) In response, the VE provided two examples of positions at a sedentary level: an

unarmed sedentary security guard, and an assembler. (Tr. at 538) The VE also provided two

examples of light positions that would be able to be performed: a cashier and a packer. (*Id.*)

The ALJ then posed additional limitations—that the person would have manipulatively

frequent instead of constant fingering and feeling—and asked how that would affect the jobs

cited; the VE responded that the person could still perform the jobs of sedentary security guard

and cashier, but not assembler and packer. (*Id.*) The ALJ then asked if there would be other

jobs available within those limitations, to which the VE provided order clerk at the sedentary

level, and inspector at the light level. (Tr. at 538A) The VE further testified that the jobs cited

were consistent with the DOT. (*Id.*) The ALJ then asked if there would be any work at all that

a person could do considering all of the limitations that Jacquet had claimed, including her

limitations on standing, sitting, walking, lifting, and her problems with memory and

23

concentration, to which the VE replied: "I would say no." (*Id.*) Jacquet's attorney then examined the VE and asked about particular limitations that might impact the ability to perform the cited jobs. (Tr. at 538A–543)

### 3. The Second Administrative Hearing

#### a. Jacquet's Testimony

At the beginning of the second hearing, the ALJ informed Jacquet's attorney that in her view, the only "issue [on remand that would be explored at the hearing] is mental." (Tr. at 627) Jacquet's attorney stated that he was also "concerned about . . . whether or not she meets [] listing . . . 9.08A" but the ALJ replied that "I'm only considering mental[.]" (*Id.*) Jacquet's attorney also made reference to exploring how Dr. Mark's opinion would affect a VE hypothetical or an RFC determination, and the ALJ said that the attorney could raise that issue with the VE. (*Id.*) Jacquet's attorney also argued that one of Dr. DuShuttle's medical records [the one from June 2, 2005] suggested that Jacquet's knee pain was a severe impairment, though the ALJ disagreed. (Tr. at 627-28)

After again being informed by the ALJ that the focus of the hearing testimony should be on Jacquet's mental impairments, Jacquet's attorney questioned Jacquet. (Tr. at 628–39) Jacquet testified that she did not seek mental health treatment more than once because she believed that if she took care of the pain from her physical ailments first, she would be able to manage everything else. (Tr. at 632-33) Jacquet further testified that her depression did not go away once she had begun to treat the pain, and made it difficult for her to focus and concentrate, which led to her making unacceptable mistakes at her last job as a supervisor and cook. (Tr. at 633–34) Jacquet recalled that her ability to remember became worse after she stopped working

24

and that she had trouble remembering daily tasks at home, such as whether she had paid certain bills, what her account numbers were, or what conversations she had with others. (Tr. at 634-37) Jacquet explained that she had believed taking medication would help her focus and have more clarity, but that it instead caused her to "just go to sleep right in the middle of a conversation, or just be fogged in [her] mind sometimes." (Tr. at 635) She testified that she had tried different medications for the pain and the depression, eventually settling on Cymbalta, which she took for a long time. (*Id.*) Jacquet further testified that she would have "fog in the brain" on a daily basis at different times of the day, and that though she could complete household tasks, it would take her a long time to do so, even with breaks. (Tr. at 635-36)

Jacquet testified that in 2004 and 2005, she experienced problems with her emotions, including becoming emotionally upset after making mistakes at work. (Tr. at 637) When asked if she believed that, during the period from when she left work until her 50th birthday, whether she was mentally able to work an eight-hour day, five days a week, Jacquet responded that she could not. (Tr. at 638)

### b.    The Vocational Expert's Testimony

Before examination by Jacquet's attorney, the vocational expert, Diana Sims ("Sims"), acknowledged that she agreed with the testimony from the prior ALJ hearing that Jacquet's transferable skills from her prior positions would transfer to light cook positions but not to sedentary jobs. (Tr. at 640)

Jacquet's attorney then examined Sims. Sims testified that limitations listed on a certain portion of Dr. Mark's report—that Jacquet could "only sit up to four hours and can stand for one hour and walk for one hour"—would eliminate all sedentary work because that was "a total of

25

six hours, which would not be SGA." (Tr. at 641)  Sims further testified that the limitations Dr.

Mark had placed on Jacquet's use of hands would render a hypothetical person with the same

ability unable to perform the "assembler" occupation. (Tr. at 641–42)  Considering all of the

limitations in Dr. Mark's evaluation, Sims opined that there would be no work for a

hypothetical person with those abilities. (Tr. at 642)  Sims further opined that, if one credited

the extent of Jacquet's own testimony regarding the intensity of her pain, related depression, and

limitations on focusing and concentrating, there would be no work that such a person could

perform. (*Id.*)

     The ALJ then examined Sims, and referred back to VE Reed's prior testimony that a

position existed at the sedentary level of unarmed security guard. (Tr. at 642-43)  Sims

explained that yes, at the sedentary, unskilled level, there is a position titled "security monitor"

that is a type of security or surveillance job. (Tr. at 643)  She explained that in the region, there

were 300 such jobs and 250,000 such jobs in the national economy. (Tr. at 643–44)  Jacquet's

attorney then re-examined Sims, who testified that if a person was taking medication that caused

drowsiness, and if the drowsiness prevented such a person from being productive "at least 80

percent of the time," then work as a security monitor would be precluded, as the person would

not be able to "focus on the screen and pay attention to what's going on." (Tr. at 644–45)

### 4.     The ALJ's Findings

     On July 17, 2010, the ALJ issued the following findings, which are at issue here:

1. The claimant meets the insured status requirements of the Social
Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since
August 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and
416.971 *et seq.*).

3. The claimant has the following severe impairments: cognitive disorder, mood disorder, diabetes mellitus, diabetic neuropathy and obesity[3] (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, unskilled sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is occasionally able to climb stairs or ramps, and occasionally balance, stoop, kneel, crouch, and crawl but never climb a ladder, rope or scaffold. She must avoid concentrated exposure to extreme cold, vibration and hazards (machinery, heights, etc.).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 22, 1956 and was 47 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See [Social Security Ruling ("SSR")] 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social

---

[3]     The ALJ found that Jacquet's knee and back impairments were not severe impairments under the law.  (Tr. at 560)

Security Act, from August 1, 2004, through September 21, 2006 (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 549-73)[4]

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. In determining the appropriateness of summary judgment, the Court must

"review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving

party' but not weighing the evidence or making credibility determinations." *Hill v. City of

Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but

more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005) (internal quotation marks and citation omitted). In analyzing whether substantial

evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review

---

[4]        The content and findings from the ALJ's first decision, which will be noted herein where relevant, are also contained in the administrative transcript. (Tr. at 17-31)

of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190–91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*

## III.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for benefits, the claimant must establish that she was disabled prior to the date she was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

29

of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment meets or equals an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment fails to meet or medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled

30

if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Social Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted). A claimant's RFC is determined by identifying any functional limitations or restrictions and assessing her work-related abilities on a function-by-function basis. 20 C.F.R. 404.1545(b)-(d). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428 (citation omitted).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden of production is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.* (citation omitted).

## B. Ms. Jacquet's Arguments On Appeal

On appeal, Jacquet presents five arguments: (1) the ALJ failed to properly accommodate the side effects of Jacquet's medications; (2) the ALJ failed to include Jacquet's mental

31

limitations in the RFC finding; (3) the ALJ's severity finding was legally deficient; (4) the ALJ

failed to conduct a proper listings analysis; and (5) the ALJ erred in weighing the medical

opinions of record.  (D.I. 14)  The Court will consider each set of arguments in turn.

### 1.    Whether the ALJ Failed to Accommodate the Side Effects of Jacquet's Medication

Jacquet's first argument relates to the ALJ's asserted failure to accommodate the side

effects of her medications.  The ALJ determined at step three of the evaluation process that

Jacquet had "moderate difficulties" with regard to concentration, persistence, or pace.  (Tr. at

561)  At step four of the process, the ALJ found that Jacquet had the RFC to perform "simple,

unskilled sedentary work" and did so "specifically to address the [e]ffects of the claimant's

medication side effects[.]"  (Tr. at 562, 570)

In articulating why a restriction to "simple, unskilled" sedentary work was appropriate,

even in light of the side effects Jacquet experienced from medication, the ALJ appears to have

relied on two primary sources: on Jacquet's prior testimony and on Dr. Keyes' opinion

regarding Jacquet's mental impairments.  (Tr. at 566 ("The undersigned concludes that based

upon Dr. Keyes' opinion and the claimant's testimony that she is able to perform the essential

mental functions of work [and that her RFC] as assigned at simple, unskilled work does not

exceed her ability to perform the basic mental functions of work while on mental medications,

considering her medication side effects . . . ."))

With regard to Jacquet's testimony, the ALJ noted that, in the first hearing, Jacquet

testified:  (1) that her pain medication caused some amount of memory loss; (2) that she had not

treated with a mental health professional; and (3) that she was able to read, write and perform

simple math functions.  (Tr. at 565-66)  The ALJ also cited Jacquet's testimony from the second

32

hearing, in which Jacquet again explained that in the relevant period: (1) she experienced

difficulty concentrating and focusing, or remembering to do certain things; and (2) her

medications caused her to become drowsy at times or to suffer from a kind of "'brain fog[.]'"

(Tr. at 566) Much of this testimony spoke to the type of mental limitations that would make it

difficult to perform any job, and that was certainly Jacquet's point in reciting these effects at the

respective hearings. (*Id.*)

However, the ALJ obviously also relied heavily on Dr. Keyes' opinion, noting that Dr.

Keyes concluded that Jacquet:

> [H]ad no limitations in her ability to understand, remember
> and carry out simple instructions. . . . She had no limitation
> in her ability to respond to changes in a routine work setting
> and she was mildly limited in her ability to interact
> appropriately with the public, supervisors and co-workers.

(Tr. at 566; *see also* Tr. at 453) The ALJ also specifically noted Dr. Keyes' references to the

fact that upon examination in 2007, Jacquet was cognitively alert and responsive, that she could

count and recite the alphabet with nearly an error, and that her immediate and recent memory

appeared intact. (Tr. at 561) Taken together, the ALJ's reliance not only on Jacquet's

testimony, but also on Dr. Keyes' opinion, indicates that while the ALJ credited Jacquet's

testimony as to the existence of certain memory- and concentrated-related limitations, the ALJ

found (as did Dr. Keyes) that these limitations were not significant enough to preclude Jacquet

from engaging in the tasks inherent in simple, unskilled work.[5]

---

[5]     At another point in the ALJ's decision, the ALJ approvingly cited the February
2006 findings of Ms. Cohen, the social worker who examined Jacquet, that Jacquet's
concentration was "adequate[,]" that her attention and memory were "intact" and that her
intelligence was average. (Tr. at 561; *see also* Tr. at 323) As the Commissioner notes, (D.I. 19
at 21), these findings and others in the record can be seen to gibe with Dr. Keyes' conclusions.

33

Jacquet argues that although the ALJ found that Jacquet had moderate difficulties with regard to "concentration, persistence or pace," the ALJ did not include sufficiently adequate limitations to account for that finding into the RFC determination or into the hypothetical question posed to VE Reed. (D.I. 14 at 9-10)  Jacquet's argument therefore hinges on whether a limitation to "simple, unskilled" sedentary work adequately conveyed that Jacquet had moderate difficulties with regard to concentration, persistence or pace. (*Id.* at 10)  A reliable RFC assessment must account for all of a claimant's credibly established limitations, so that if an impairment causes a limitation, then it must be reflected in the RFC assessment. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Holmes v. Astrue*, Civil Action No. 08–545, 2009 WL 688914, at *12 (W.D. Pa. Mar. 12, 2009).[6]

In support of her argument, Jacquet relies heavily on the Third Circuit's decision in *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir.2004). (D.I. 14 at 10-11)  In *Ramirez*, the claimant appealed the Commissioner's denial of her claims for SSI benefits, arguing that the ALJ's

---

(*See also* Tr. at 204 (Dr. Kurz's 2005 evaluation noting that Jacquet's attention, pace registration and memory skills were adequate for evaluation))

    [6]    Similarly, in order for a VE's testimony to constitute substantial evidence that a claimant can perform work in the national economy, a hypothetical question must adequately convey all of the claimant's limitation-causing impairments. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004); *Holmes*, 2009 WL 688914, at *12. "[O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *Rutherford*, 399 F.3d at 554 n.8. Challenges asserting that the VE's testimony is unreliable because the ALJ failed to recognize credibly established limitations during the RFC assessment and therefore did not convey those limitations to the VE "are really best understood as challenges to the RFC assessment itself." *Id.* Here, just as the ALJ's RFC finding limited Jacquet to simple, unskilled sedentary work, the relevant hypothetical question posed by the ALJ to VE Reed at the first hearing (the response to which, in turn, informed VE Sims' comments at the second hearing and the ALJ's conclusions thereafter) included the same type of limitation. (Tr. at 538, 572, 642-45). Therefore, the Court interprets the challenge here as one best understood to go to the ALJ's RFC finding, and will further analyze it as such.

34

hypothetical question to the VE failed to accurately convey all of her limitations, and that the

Commissioner's ensuing decision was therefore not supported by substantial evidence.

*Ramirez*, 372 F.3d at 547. The ALJ had noted that the claimant "often" experienced

"deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a

timely manner (in work settings or elsewhere)." *Id.* at 549 (internal quotation marks and

citation omitted).[7] However, the hypothetical provided to the VE did not include reference to

the deficiencies as to concentration, persistence or pace, but rather only limited the hypothetical

claimant to "simple one to two step tasks." *Id.*

  The Third Circuit agreed with the claimant and held that the ALJ's hypothetical did not

accurately convey all of the claimant's impairments and limitations, and that the ALJ's decision

was therefore not supported by substantial evidence. *Id.* at 552. In so doing, the Third Circuit

emphasized that limiting a job to one to two step tasks was particularly problematic because it

did not take into account deficiencies in pace, and that "an individual with deficiencies in pace

might be able to perform simple tasks, but not over an extended period of time." *Id.* at 554.

This was especially important in *Ramirez* because the jobs identified by the VE as suitable for

the claimant (including assembler, packer, and inspector) all had daily production quotas that

required a certain degree of pace. *Id.*

  Since *Ramirez* however, the Third Circuit has repeatedly found that limitation of a

---

[7]  The five-point scale for rating the degree of mental impairment in concentration, persistence, or pace was revised in August 2000 from "never, seldom, often, frequent, and constant," to "[n]one, mild, moderate, marked, and extreme." *See* 65 Fed. Reg. 50746, 50775 (2000); 20 C.F.R. § 404.1520a. Some courts have noted that a "finding of 'often' under the old scale therefore roughly equates to a 'moderate' deficiency" under the revised scale. *Colon v. Barnhart*, 424 F. Supp. 2d 805, 811 (E.D. Pa. 2006); *see also Dynko v. Barnhart*, No. 03-CV-3222, 2004 WL 2612260, at *5 n. 34 (E.D. Pa. Nov. 16, 2004).

claimant's ability to work to performing "simple routine tasks" (or to a limitation phrased similarly) is not necessarily insufficient to convey the impact of a claimant's moderate limitations in maintaining concentration, persistence or pace. *McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008); *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008); *see also Russo v. Astrue*, 421 F. App'x 184, 192 (3d Cir. 2011) (finding that, *inter alia*, a hypothetical question including the restriction that an individual "would not have a quota to fulfill" adequately accounted for a claimant's moderate difficulties with concentration, persistence, and pace). This is in part because the phrase "'simple routine tasks'" (or references to "simple, unskilled" work) typically refers to the non-exertional or mental aspects of work, and to tasks that involve "low stress level work that does not require maintaining sustained concentration." *Menkes*, 262 F. App'x at 412; *see also Douglas v. Astrue*, Civil Action No. 09–1535, 2011 WL 482501, at *5 (E.D. Pa. Feb. 4, 2011) ("Unskilled work is consistent with simple, routine tasks."). In light of this, courts in this Circuit have tended to read *Ramirez* to suggest that greater specificity in the vocational hypothetical is required in cases where the record clearly established "additional specific deficiencies in concentration, persistence, and pace [that] can not be properly conveyed in a hypothetical limited to simple tasks." *Christner v. Astrue*, Civil Action No. 08–991, 2009 WL 186010, at *9 (W.D. Pa. Jan. 27, 2009); *see also Santiago-Rivera v. Barnhart*, Civil Action No. 05-5698, 2006 WL 2794189, at *11-12 (E.D. Pa. Sept. 26, 2006).

Here, in contrast to the situation in *Ramirez*, Jacquet never really articulates *why* (with one exception, discussed below) any portion of the record establishes that the ALJ's own findings—that Jacquet had moderate deficiencies in concentration, persistence or pace—were

36

not adequately captured by an RFC that included limitation to simple, unskilled work. (D.I. 14 at 9-11; D.I. 21 at 1-3) Instead, in most of her briefing on this issue, Jacquet seems to assume that *Ramirez* stands for the proposition that such a limitation can never appropriately account for moderate deficiencies in concentration persistence or pace, and that its inclusion in Jacquet's RFC amounts to a *per se* legal error. As the Court has noted above, this is not the law.

The one portion of the record that Jacquet does cite in support of her argument is to limitations in concentration as described by Jacquet at the second hearing. (D.I. 14 at 11) As noted above, at this hearing, Jacquet discussed the impediments to her ability to focus and concentrate, explaining that: (1) at her prior job as a cook and supervisor at a nursing home, she was unable to remember residents' diets; (2) outside of work, at times she could not remember when she paid certain bills, recall certain conversations she had, remember where she was driving or keep track of certain account numbers; and (3) her medication caused her to drop off to sleep during conversations and to generally be "fogged in [her] mind" on a daily basis. (Tr. at 634-36) When VE Sims testified next, Jacquet's attorney asked her whether the problems Jacquet described "with the depression, the difficulty with focusing, [and] the side effects of the medi[c]ation" would limit or restrict Jacquet's ability to do sedentary work. (Tr. at 642) VE Sims replied that "basing this on the testimony given" regarding "the intensity of the pain that was described . . . [and] the limitations [on] focusing and concentrating" Jacquet would not be able to perform sedentary work. (*Id.*) Jacquet's attorney later asked VE Sims about the security monitor position, and how the ability to perform that job would be impacted if a person took narcotic pain medications that caused them to be drowsy. (Tr. at 644) VE Sims replied that if a person was taking medication that caused drowsiness, and that the drowsiness prevented such a

person from being productive "at least 80 percent of the time," then the person could not work in the position, because they would not be able to "focus on the screen and to pay attention to what's going on." (*Id*. at 644–45)

A claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled[.]" 20 C.F.R. § 404.1529(a). While a claimant's "statements about the intensity and persistence of [her] pain or other symptoms" must be given serious consideration, those statements must also "reasonably be accepted as consistent with the medical signs and laboratory findings" of record. *Id*. The ALJ can reject limitations asserted by the claimant that lack objective medical support if there is conflicting evidence in the record. *Rutherford*, 399 F.3d at 554.

Here, in determining the extent of Jacquet's limitations on concentration, persistence and pace, and assigning great weight to Dr. Keyes' opinion, the ALJ noted that Dr. Keyes "was able to examine [Jacquet] in person and compare her subjective complaints against known objective standards[,]" that his opinion was "consistent with the medical record as a whole," and that his examination confirmed the conclusion that Jacquet retained the ability to perform simple, unskilled work. (*Id.* at 570-71) The limitations on Jacquet's ability to concentrate or focus, as she described them at the second hearing, do appear to be in conflict with Dr. Keyes' conclusions that Jacquet had no limitations in her ability to understand, remember and carry out simple instructions in the workplace. In the same vein, Dr. Keyes' analysis of Jacquet clearly does not suggest someone who (like the hypothetical person referenced by VE Sims at the second hearing) would be unable to be productive "at least 80 percent of the time," unable to focus on a computer screen or unable to pay attention to her surroundings while working as a

38

security monitor. (*Id.*) Faced with these conflicts, the ALJ was permitted to resolve it by crediting the conclusions of a medical expert like Dr. Keyes, over Jacquet's own testimony about the extent of her mental limitations.

In sum, there was substantial evidence in the record supporting the ALJ's decision to discount certain of Jacquet's testimony regarding mental limitations due to medication that could be said to be inconsistent with the relevant RFC. As Jacquet points to no other reasons why that RFC's limitation to simple, unskilled sedentary work failed to capture the extent of her limitations, the Court finds that the ALJ's decision was supported by substantial evidence and was not in error.

## 2. Whether the ALJ Failed to Include Certain Other Mental Limitations in the RFC Finding

Next, Jacquet contends that the ALJ erred with regard to her analysis of Jacquet's mood disorder and cognitive disorder. (D.I. 14 at 12-13; D.I. 21 at 3-4) Jacquet notes that the ALJ found these two disorders to each amount to "severe impairments." (D.I. 14 at 12; Tr. at 552) However, Jacquet argues that the ALJ's RFC assessment failed to include "any specific mental limitations in her [RFC] finding[,]" and particularly none that relate to these two disorders. (D.I. 14 at 12) Jacquet reasons that since a "severe impairment" is one that limits a person's ability to do basic work activities, it is "inconsistent" for the ALJ to have found that these two severe impairments existed, but not to have ascribed any specific limitations to Jacquet's ability to work due to the impairments. (*Id.; see also* D.I. 21 at 3)

Contrary to Jacquet's argument, it is clear that the ALJ did intend to ascribe limitations to Jacquet's RFC relating to Jacquet's mood disorder and cognitive disorder—by limiting Jacquet to "simple, unskilled work[.]" (Tr. at 566) The ALJ made this clear when she

concluded that:

> [T]he claimant's residual functional capacity as assigned at
> simple, unskilled work does not exceed [Jacquet's] ability to
> perform the basic mental functions of work while on mental
> medications, considering her medication side effects,
> *cognitive disorder* or her ongoing pain and *mood disorder*.

(*Id.* (emphasis added)) Later in the ALJ's decision, she again made this explicit in stating that

the RFC limitation to "[s]imple, unskilled work was assigned to address [Jacquet's] subjective

complaints of pain, medication side effects, *cognitive impairment*, memory loss and

*depression*." (Tr. at 567 (emphasis added)) Thus, the record indicates that the thrust of

Jacquet's argument—that the ALJ expressly failed to link any limitations in Jacquet's RFC to

Jacquet's mood disorder or cognitive disorder—is unsupported.

   Jacquet does not specifically make what would be the next level of argument—that

although the ALJ *did* ascribe limitations to her mood disorder and cognitive disorder, those

limitations (to simple, unskilled sedentary work) were nevertheless insufficient to capture the

impact that these disorders truly had on her ability to work.[8] Thus, Jacquet does not, for

example, point to particular restrictions imposed by these two disorders that were not

accommodated by the RFC limitations set by the ALJ. Jacquet also does not specifically argue

that the security monitor position identified by VE Sims is incompatible with limitations

imposed by these two disorders.

   In light of this, the Court is unwilling to ascribe error here, or find that a limitation to

---

   [8]    Instead, the only further argument Jacquet makes in this section of her briefs is the
same one she made earlier, regarding the ALJ's asserted failure to ascribe sufficient RFC
limitations to Jacquet's moderate difficulties with concentration, persistence or pace. (*See, e.g.,*
D.I. 14 at 12-13) This argument was previously addressed in Section III.B.1.

"simple, unskilled" sedentary work is necessarily incompatible with the type of restrictions that

flowed from these two disorders. There may well be situations where an RFC limited in this

way would be insufficient to convey the mood-related or cognitive-related limitations of a

claimant. But, on the other hand, there are also numerous cases where courts have set out a

claimant's RFC in similar terms to that here, in order to reflect the impact of just these kind of

severe impairments. *See, e.g., Evers v. Colvin*, No. CV-12-01412-PHX-ROS, 2013 WL

1933932, at *1 (D. Ariz. May 9, 2013) (finding that claimant had the RFC to perform "simple,

unskilled work" in light of severe impairments including "mood disorder"); *Redfield v. Comm'r*

*of Soc. Sec.*, 366 F. Supp. 2d 489, 497 (E.D. Mich. 2005) (finding that ALJ did not err in

accounting for plaintiff's low IQ with an accommodation for "simple, repetitive tasks" where an

examining psychologist determined that plaintiff had no impairment with understanding,

remembering and carrying out short, simple instructions and only slight impairment in judgment

concerning simple, work-related decisions).

     In the absence of an articulation as to why the limitation imposed by the ALJ is

insufficient in this particular case, the Court finds that Jacquet's assertion of error on this ground

is unavailing.

### 3.  Whether the ALJ's Step Two Severity Finding was Legally Deficient

     Jacquet next argues that the ALJ erred at the second step of the sequential evaluation

process. In her decision, the ALJ noted that the Appeals Council's order on remand

"highlighted the claimant's knee pain and back pain as impairments needing further discussion."

(Tr. at 557)  The ALJ then set out the medical evidence regarding these ailments in some detail,

and ultimately concluded that Jacquet's knee pain and back pain did not amount to severe

impairments. (Tr. at 558-60) In doing so, the ALJ did not completely discount Jacquet's

reports of pain or discomfort in these areas. Instead, the ALJ determined that Jacquet's

symptoms relating to this pain did not ultimately impact her ability to perform sustained work

activities. (*See, e.g.*, Tr. at 559 ("The undersigned concludes that although the claimant

experienced some pain and discomfort from her knee impairment on an occasional basis, the

pain did not significantly affect her ability to perform sustained work activities [and is] therefore

non-severe."); Tr. at 560 ("While the undersigned notes that the claimant does experience

occasional episodes of back pain and discomfort, the undersigned concludes that based on the

medical record as a whole, the claimant's symptoms are generally well controlled with her

medication and do not have a significant impact on her ability to perform sustained work

activities."))[9]

    Jacquet asserts that the ALJ's decision that her knee and/or back pain were not severe

impairments was in error. (D.I. 14 at 13-15) The Third Circuit has explained that the step two

inquiry into severity "is a *de minimis* screening device to dispose of groundless claims." *Newell*

*v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003); *see also Rosa v. Comm'r of Soc. Sec.*,

Civil Action No. 12-5176 (JLL), 2013 WL 5322711, at *6 (D.N.J. Sept. 20, 2013). An

impairment is "severe" if the evidence presented by a claimant demonstrates more than a "slight

---

[9]    In its order on remand, the Appeals Council noted the extent of Jacquet's knee
and back limitations and stated that the ALJ should engage in "further evaluation" of those
"musculoskeletal impairments[.]" (Tr. at 587) In her second decision, the ALJ did, in fact,
follow this command, by engaging in a renewed analysis of these impairments. The ALJ
assessed the severity of the impairments at step two, and (as is further described below) also
considered the impact of the impairments in making an RFC assessment at step four. (Tr. at 558-
60, 563-72) The ALJ's review and analysis of these impairments was far more detailed than it
had been in her first decision, (Tr. at 22), and thus, the purpose of the Appeals' Council's
directive can be said to have been accomplished here.

abnormality," having "no more than a minimal effect" on the claimant's ability to do basic work activities. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (internal quotation marks and citations omitted); *see also Newell*, 347 F.3d at 546. Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. *McCrea*, 370 F.3d at 360; *Newell*, 370 F.3d at 546-47.

However, even if a court errs at step two in concluding that an impairment is non-severe, that error may be harmless. *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007); *Rivera v. Comm'r of Soc. Sec.*, 164 Fed. App'x 260, 262 n.2 (3d Cir. 2006); *Williams v. Comm'r of Soc. Sec. Admin.*, Civil No. 12-5637, 2013 WL 4500335, at *17 (D.N.J. Aug. 21, 2013). Harmless error occurs in this context where the ALJ finds that the claimant suffers from other severe limitations, and therefore proceeds past step two through the subsequent steps of the five-step sequential evaluation process. *Williams*, 2013 WL 4500335, at *17. In formulating an RFC determination, if the ALJ thereafter fairly considers the combined effects of all of the plaintiff's severe and non-severe impairments, and incorporates any resulting limitations into the RFC, then any error at step two is deemed harmless. *See, e.g., id.; Neff v. Astrue*, 875 F. Supp. 2d 411, 424 (D. Del. 2012); *see also* 20 C.F.R. §§ 404.1545(a)(2) & (e) (requiring consideration of both severe and non-severe impairments, and limitations relating to them, in formulating a claimant's RFC). For the reasons set forth below, even if the ALJ here erred in failing to consider Jacquet's knee pain and/or back pain to be severe impairments, any such error was harmless.[10]

---

[10]     In her briefs, Jacquet alleges that despite the Appeals Council's order that the ALJ further evaluate Jacquet's musculoskeletal impairments, at the second hearing, the ALJ solely focused on "'mental' issues" and refused to allow Jacquet's attorney to solicit testimony

The ALJ's decision clearly indicates that, although she did not find Jacquet's knee or back pain to be a severe impairment, she took into account the effects of those ailments in assessing Jacquet's RFC. In discussing the RFC determination, for example, the ALJ stated that she had evaluated the "medical record as a whole[,]" and "considered the [e]ffects of the claimant's impairments and her pain in assigning a[n RFC] at a sedentary exertion level." (Tr. at 567) In doing so, the ALJ explained that the "claimant's postural and environmental limitations were assigned to consider [Jacquet's] severe impairments *and non-severe impairments*, pain, and medication side effects." (*Id.* (emphasis added))

The ALJ's decision is also sufficiently detailed such that the Court can link certain limitations present in the RFC determination to medical evidence of record regarding Jacquet's knee and back pain. With respect to knee pain, for example, Dr. DuShuttle was one of the physicians who had examined Jacquet's knee during the relevant period. (Tr. at 558) In her second decision, the ALJ specifically noted Dr. DuShuttle's conclusion that Jacquet should "avoid repetitive kneeling, squatting and stair climbing[.]" (Tr. at 567; *see also* Tr. at 250 (Dr. DuShuttle noting in April 2005 that Jacquet should "avoid repetitive kneeling, squatting and stairs.") Later in the decision, the ALJ explained that she had assigned "weight to Dr. DuShuttle's opinion[,]" and had concluded that the opinion was "generally consistent with the

_____

regarding knee and back impairments. (D.I. 14 at 14) Jacquet argues that this indicates that the ALJ "was not seriously considering on remand" whether these two limitations were severe. (*Id.*) It is true that at the beginning of the second hearing, the ALJ made it clear that she would hear additional testimony only as it related to Jacquet's mental limitations. (Tr. at 625-29) Yet in the end, even Jacquet does not suggest that the ALJ's approach to the second hearing is the dispositive issue here. Instead, Jacquet's primary argument is that the evidence in the record amply demonstrated the severity of the impairments, and the ALJ simply erred in her review and analysis of that evidence.

44

occasional postural limitations in the claimant's residual functional capacity as assigned[.]" (Tr. at 569). In turn, the ALJ assigned an RFC that limited Jacquet to sedentary work in line with requirements set out by Dr. DuShuttle—that Jacquet only "occasionally balance, stoop, kneel, crouch and crawl but never climb a ladder, rope or scaffold." (Tr. at 562)

Similarly, with respect to Jacquet's knee and back pain, Dr. Islam was one of the primary physicians to treat Jacquet during the period of disability for these ailments. (Tr. at 559) The ALJ noted Dr. Islam's conclusion that Jacquet was "not able to stand or walk for prolonged periods of time" and could sit for eight hours in a work day, stand for two hours or less and lift up to 10 pounds. (Tr. at 567; *see also* Tr. at 409-10 (Dr. Islam's December 2005 examination and report setting out these limitations)) It is clear that Dr. Islam's opinion as to Jacquet's capabilities impacted the ALJ's finding that Jacquet could perform only sedentary work (a finding consistent with the nature of the limitations Dr. Islam noted)—as the ALJ assigned that opinion "great weight[.]" (Tr. at 571 (noting that Dr. Islam "is a treating physician, whose detailed treatment notes [document] her conclusion that the claimant could perform sedentary work activities during the period in question")); *see also* 20 C.F.R. § 404.1567(a) (defining sedentary work).

Notably, although Plaintiff takes issue with the ALJ's decision not to term these two impairments "severe," she never articulates in what way the ALJ's RFC finding was lacking, or how it insufficiently accounted for limitations arising from Jacquet's knee and back pain. (D.I. 14 at 13-15; D.I. 21 at 4-5) In such cases, courts have found any error at step two regarding the impairments to be harmless. *See, e.g., Rosa*, 2013 WL 5322711, at *7 (finding that although ALJ wrongly determined that plaintiff's dysthymic disorder was not severe, any error was

harmless, as ALJ proceeded past step two, considered the disorder at the remaining steps of the
sequential evaluation process and limited plaintiff to "'simple, unskilled, and repetitive' work"
to account for the disorder in her decisional RFC) (citation omitted); *Jones v. Astrue*, Civ.
Action No. 10-3226 (NLH), 2011 WL 4478489, at \*9 (D.N.J. Sept. 26, 2011) (finding that even
if ALJ's decision not to consider claimant's cervical condition a severe impairment was error,
any error was harmless, where ALJ proceeded past step two, discussed the cervical condition in
determining an RFC and where there was no evidence to suggest that classifying the cervical
condition as a severe impairment would have resulted in a different RFC or job classification);
*McCartney v. Comm'r of Soc. Sec.*, Civil Action No. 07-1572, 2009 WL 1323578, at \*16 (W.D.
Pa. May 8, 2009) ("Here the ALJ proceeded with the sequential evaluation process and denied
benefits at step five. In so doing, the ALJ considered all of Plaintiff's impairments, including
his headaches, in determining his [RFC]. Accordingly, even if the ALJ had found that
Plaintiff's headaches were a severe impairment, such a finding would not have changed the
ALJ's assessment, and thus, any error was harmless.").

Here the Court comes to the same conclusion. In light of the fact that the ALJ
incorporated limitations into her RFC relating to Jacquet's knee and back pain, and that those
limitations were consistent with limitations set by the treating physicians who assisted Jacquet
with those ailments, the Court finds any failure to consider the impairments "severe" to be
harmless error.

### 4. Whether the ALJ Failed to Conduct a Proper Listings Analysis

Jacquet's next argument is that the ALJ erred in analyzing whether Jacquet's

impairments met or equaled then-applicable Listing 9.08A.[11] (D.I. 14 at 16-19) Listing 9.08A

was diabetes mellitus with neuropathy "demonstrated by significant and persistent

disorganization of motor function in two extremities resulting in sustained disturbance of gross

and dexterous movements, or gait and station (see 11.00C)[.]" 20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 9.08A (2011); *see also Christl v. Astrue*, Civil Action No. 08-290, 2008 WL 4425817,

at *8 (W.D. Pa. Sept. 30, 2008).[12] Jacquet argues that: (1) at the second hearing, the ALJ

refused to consider or hear testimony as to whether Jacquet's impairments met or equaled the

Listing; (2) the ALJ's "summary conclusion" that Jacquet did not meet or equal the Listing does

not allow for meaningful judicial review; and (3) in any event, that decision is not supported by

substantial evidence. (D.I. 14 at 18-19; D.I. 21 at 5-8) The Commissioner counters that the

ALJ's decision does allow for meaningful judicial review, and that the ALJ properly concluded

that Listing 9.08A's requirements were not met here. (D.I. 19 at 25-28) The Commissioner

further contends that even if the ALJ's explanation was insufficiently detailed, any error in that

regard is harmless, because the evidence cannot demonstrate that Jacquet satisfies the Listing.

(D.I 19 at 27)

---

[11]    The parties filed the briefing for this matter in 2011. In 2011, the listings
changed, such that Listing 9.08A no longer exists, and other listings are now utilized to address
the effects of diabetes mellitus. 76 Fed. Reg. 19,692, 19,694 (Apr. 8, 2011); *James v. Colvin*,
Civil Action No. 3:11CV-640-S, 2013 WL 4096977, at *8 & n.16 (W.D. Ky. Aug. 13, 2013).

[12]    Listing 11.00C further explained: "[p]ersistent disorganization of motor function
in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory
disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or
peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides
the sole or partial basis for decision in cases of neurological impairment. The assessment of
impairment depends on the degree of interference with locomotion and/or interference with the
use of fingers, hands, and arms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C (2011)
(emphasis omitted); *see also McCleary v. Astrue*, Civil Action No. 10-1116, 2011 WL 4345892,
at *7 (W.D. Pa. Sept. 15, 2011).

In the proceedings below, Jacquet clearly asserted, at both the first and second hearings,

that her diabetes mellitus with neuropathy met or equaled Listing 9.08A. (Tr. 314-15, 476-477,

627) In her first decision, the ALJ, after summarizing the medical evidence, stated:

> The undersigned specifically considered listing 9.08, however, the
> medical record and the testimony of the claimant fail to provide
> sufficient support for a finding that she meets the limitations
> required by this listing.

(Tr. at 22) After declining to hear argument or evidence on the issue at the second hearing, (Tr.

at 627), in her second decision, the ALJ incorporated by reference her analysis of the listings

alleged by Jacquet at the first hearing, and concluded:

> No evidence in the medical record supported a conclusion that the
> claimant's impairments met a Listing previously and the record
> does not support a change in this finding. In this regard, the
> undersigned has particularly considered the listings contained at
> Sections 9.00 *et seq.* (endocrine system disorders) and Sections
> 11.00 *et seq.* (neurological system disorders) and finds that the
> precise criteria of the listings has not been met. Moreover, no
> physician has mentioned any findings equivalent in severity to any
> listed impairment, nor are such findings indicated or suggested by
> the evidence of record.

(Tr. at 560)

On appeal at least, the parties' arguments on this issue (as to why Jacquet's impairment

did or did not meet or equal Listing 9.08A) are narrowly focused. For example, the

Commissioner does not assert in its briefing that the record evidence failed to demonstrate

"significant and persistent disorganization of motor function in two extremities." (D.I. 19 at 26-

27) And for her part, Jacquet does argue that such disorganization of motor function resulted in

"sustained disturbance of gross and dexterous movements." (D.I. 19 at 26 n.10; D.I. 21 at 7-8)

Instead, Jacquet asserts (and the Commissioner disputes) whether any disorganization of motor

function in these extremities (Jacquet's feet) resulted in a "sustained disturbance of . . . gait and station." (D.I. 19 at 27; D.I. 21 at 8 ("noting that the issue is whether "Ms. Jacquet had disturbance of her gait and/or station").[13]

In making a decision as to the applicability of Listing 9.08A, the ALJ was required to provide an explanation of her reasoning at step three in order to allow for meaningful judicial review. *Burnett*, 220 F.3d at 119-20. On the one hand, an ALJ cannot satisfy this requirement merely by making a conclusory statement that a claimant's impairment did not meet or equal a listing, without citing to the particular medical evidence the ALJ considered or to the reasoning the ALJ utilized in coming to that conclusion. *Id.*; *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *Mercer v. Barnhart*, No. CIV. A. 00-740-SLR, 2002 WL 125684, at *12 (D. Del. Jan. 17, 2002). On the other hand, an ALJ need not specify a particular listed impairment in order for the decision to be judicially reviewable—so long as her decision clearly analyzes and evaluates the relevant medical evidence as it relates to the listing requirements at issue.[14]

Here, the ALJ's analysis of this issue, in both the first decision and the second decision,

---

[13]     A disturbance in one's gait may be demonstrated by the existence of an "antalgic" gait, which occurs in a limb "'in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side.'" *Wilson v. Astrue*, Civil Action No. 09-33 Erie, 2010 WL 1838008, at *2 n.4 (W.D. Pa. May 5, 2010) (citation omitted); *Lambertson v. Astrue*, 625 F. Supp. 2d 160, 163 n.4 (D. Del. 2009) ("An antalgic gait is, generally, a gait abnormality where an individual favors certain motions to avoid pain.").

[14]     *See, e.g.*, *Scuderi v. Comm'r of Soc. Sec.*, 302 Fed. App'x 88, 90 (3d Cir. 2008) (finding that although an ALJ did not specifically mention a listed impairment in the decision, the decision reflected adequate consideration of the portion of the listing at issue—whether the claimant suffered from "disorganization of motor function" in his extremities—where the ALJ "concluded" that the claimant had "normal motor, sensory, and reflex functions" in his extremities); *Rivera*, 164 Fed. App'x at 262–63 ("It is not enough for the ALJ to conclude that no medical evidence meets or equals any of the listings, in the absence of any discussion of why the specific evidence provided by the claimant was not equivalent.")

49

amounted to making conclusory statements that Listing 9.08A was not satisfied. It is true, as the Commissioner notes, (D.I. 19 at 27), that these conclusions were preceded by a description of the content of particular medical records relating to Jacquet's diabetes—including some records that touch on how Jacquet's diabetes mellitus impacted her ability to walk. However, at no point in either decision did the ALJ explain why any specific portion of that evidence compelled the conclusion that Listing 9.08A was not met (or why certain parts of that evidence were more or less compelling in driving the decision). Nor did the ALJ cite to any of the particular requirements of Listing 9.08A in setting out her conclusions. The ALJ's most specific reference to the Listing in question came in her first decision, when the ALJ wrote that the claimant "fail[ed] to provide sufficient support for a finding that she meets the limitations" required by "listing 9.08[.]" (Tr. 22) In coming to this conclusion as to Listing 9.08A, the ALJ must have determined that the evidence of record failed to demonstrate a "sustained disturbance of . . . gait and station." But in the absence of any articulation as to *why* that determination was made, the ALJ's decision does not allow for meaningful judicial review.[15]

An ALJ's failure to sufficiently explain her findings at step three can, in certain circumstances, be harmless error. *Rivera*, 164 Fed. App'x at 263. The Third Circuit has noted that harmless error exists in this context when a reviewing court examines the evidence at issue, and finds "abundant evidence supporting the [ultimate] position taken by the ALJ, and comparatively little contradictory evidence." *Id.*; *see also Rosa*, 2013 WL 5322711, at *8.

---

[15]    Also insufficient was the ALJ's statement in the first decision that "no treating or examining physician has reported findings, which either meet or are equivalent in severity to the criteria of any listed impairment, nor are such findings indicated or suggested by the medical evidence of record." (Tr. at 22) The Third Circuit has found just such language insufficiently specific in this context. *See Rivera*, 164 Fed. App'x at 263.

Here, as to the issue highlighted by the parties—whether Jacquet suffered disorganization of motor function in two extremities resulting in "sustained disturbance . . . [her] gait"—the Court cannot find the ALJ's error to be harmless. This is not a situation where there is abundant record evidence on the one side that the Listing could not apply, and little contrary evidence on the other. Instead, there is evidence that can be cited to support either side of the argument, and the question is not an easy one to resolve.

Over the first year of the period of period of disability at issue, from August 2004 through August 2005, Dr. Mann's medical records described Jacquet's gait as "[n]ormal[,]" even though Jacquet often complained of pain or discomfort in her feet. (Tr. at 260 (August 3, 2005), 264 (June 20, 2005), 267 (June 1, 2005), 270 (April 20, 2005), 274 (March 31, 2005), 278 (March 3, 2005), 282 (December 29, 2004), 286 (August 25, 2004), 290 (August 9, 2004)) At one point in August 2004, Dr. Chicko noted something different—that Jacquet "is still altering her gait when she ambulates." (Tr. at 199) But for the most part, the medical records in this time period do not explicitly suggest a disturbance of gait.

From that point on, however, the medical evidence is not one-sided—there are periods of some length where Jacquet's gait is described as either somewhat or significantly antalgic, married with intervening periods in which her gait is said to return to normal. More specifically, in September 2004, Jacquet first visited Dr. Islam, who reported that Jacquet's gait was antalgic with no focal weakness. (Tr. at 311). These problems continued through November 2004, when Dr. Islam wrote that Jacquet's gait was "abnormal . . . antalgic and step-to" and referred her to physical therapy for gait training, and December 2004, when she wrote that it was as "antalgic and slow[.]" (Tr. at 306, 309) These disturbances appeared to subside in the

51

beginning of the next year, as in January 2005, Dr. Islam found Jacquet's gait to be "stable and her arches [to be] markedly flattened with weightbearing[,]" (Tr. at 304), and in March 2005 found it to be "normal." (Tr. at 298) But by April 2005 things had worsened, as Dr. Islam described Jacquet's gait as "abnormal, very antalgic with both feet" and "antalgic, without focal weakness" during different visits. (Tr. at 295-96) In June 2005 and August 2005, Dr. Mann described the Jacquet's gait as "normal[;]"; Dr. Islam differed, noting that in two August 2005 visits that Jacquet's gait was "antalgic" and then "improved from the last visit," though "still slightly antalgic and stiff." (Tr. at 260, 264, 292, 295) In September and October 2005, her gait was noted to be slow and antalgic. (Tr. at 390, 391) Difficulties continued in December 2005 and January 2006, when Dr. Islam wrote that Jacquet's gait was "somewhat antalgic" though without "focal weakness." (Tr. at 384, 386, 387) By February 2006, Jacquet's gait was again described as "normal[,]" (Tr. at 382), but in March and April 2006, it was noted to be alternatively "somewhat stiff[,]" "somewhat slow[,]" or "steady but antalgic[,]" with no focal weakness. (Tr. at 371, 376, 379)

Medical records from May 2006 through the end of the period in question, September 2006, note that Jacquet was experiencing leg or foot pain, but make no mention, one way or the other, of alteration in her gait. (Tr. at 358-69) Testimony at the first hearing from Jacquet (*see, e.g.*, Tr. at 514, 521-25) and her witnesses (*see, e.g.*, Tr. at 529–30) suggested that Jacquet had difficulty walking throughout this time period.

In the end, it is clear from reviewing the medical records and Jacquet's testimony (Tr. at 487), that the pain in her feet and its effects were her most serious medical condition. It may be that despite this, the impact that her diabetes had on her feet and her ability to walk was not

52

significant enough to meet or equal the requirements of Listing 9.08A. But the issue appears to be a nuanced one, one that should be resolved by the fact finder, with the reasons for the decision clearly set out in detail in the record. *Cf. VanOvermeiren v. Colvin*, Civil No. 12-1352 (DWF/AJB), 2013 WL 3753437, at *14 (D. Minn. July 16, 2013) (finding substantial evidence to support ALJ's finding that plaintiff did not experience, *inter alia*, sustained disturbance of gait and station, where plaintiff was "occasionally observed to have an antalgic gait, but often his gait was normal" and where plaintiff rarely complained to treatment providers of difficulty with walking or standing). For this reason, the Court cannot find harmless error. Instead, it recommends that the issue be remanded to the ALJ for a further review of the evidence as to whether Jacquet could or could not meet this Listing, and for the ALJ to set out the reasons supporting that finding in sufficient written detail.

### 5. Whether the ALJ Erred in Weighing the Medical Opinions of Record

Jacquet lastly alleges various errors by the ALJ regarding the weight assigned to the medical opinions of record. Specifically, Jacquet argues that the ALJ erred in "inexplicably" assigning little weight to Dr. Mark's opinion and in rejecting the opinion of Dr. Allen. (D.I. 14 at 19–21) Jacquet further argues that the ALJ made the RFC finding based on her own lay opinion and rejected "any [medical source] opinions that were not consistent with her own." (D.I. 14 at 21-22) The Court will address each argument in turn.[16]

---

[16]     Jacquet also contends that the ALJ's failure to address Dr. Chicko's opinion justifies remand. (D.I. 14 at 21 n.5) The ALJ did, however, address Dr. Chicko's medical records and statements in the first decision, (Tr. at 20, 27), and incorporated by reference her discussion of the Jacquet's impairments in that first decision into her second decision, (Tr. at 562). Under those circumstances, the Court does not then find it fair to say that the ALJ ignored evidence relating to Dr. Chicko. As to how the substance of what Dr. Chicko opined should relate to the present case, the Court addresses that further below.

### a.     Dr. Mark's Opinion

Jacquet first argues that the ALJ erred in weighing the opinion of Dr. Mark, a non-treating physician, in certain ways. In the ALJ's first decision, the ALJ approvingly cited Dr. Mark's opinion, and assigned it "significant weight[.]" (Tr. at 27-28) After remand, the Appeals Council instructed the ALJ to further evaluate Dr. Mark's opinion, noting that Dr. Mark opined that Jacquet was limited to occasional fingering, but that the ALJ had not adopted these manipulative limitations nor explained any reasons for rejecting them. (Tr. at 586)

In her second decision, the ALJ wrote that she assigned "some weight" to Dr. Mark's opinion. (Tr. at 569) More specifically, the ALJ assigned weight and agreed with Dr. Mark's opinion as to exertional limitations, his conclusion that Jacquet did not require a cane to ambulate, and his restrictions as to climbing and the need to avoid exposure to heights, extreme cold and vibrations. (*Id.*) However, the ALJ assigned the remainder of the opinion little weight, particularly as to Dr. Mark's "manipulative limitation because the claimant's testimony reflects that she can perform basic manipulative functions." (*Id.*) Finally, the ALJ noted that the job cited by VE Reed, "system surveillance monitor (DOT code 379.367-010), involves . . . no manipulative limitations" and that, as a result of this and other factors, this job "is consistent with all of Dr. Mark's limitations even if his limitations are not all assigned significant weight." (*Id.*)

Jacquet's initial complaint regarding the ALJ's treatment of Dr. Mark's opinion is that while the ALJ "concluded that [the opinion] would not preclude work as a surveillance system monitor, even if it were adopted" this is "simply contrary" to VE Sims' testimony at the second hearing. (D.I. 14 at 19) At the second hearing, Jacquet's counsel asked VE Sims whether Dr.

Mark's recommended limitations, if credited, "eliminate all sedentary work"; the VE replied

that they would, because "basically [then] we're looking at a person who can only sit up to four

hours and can stand for one hour and walk for one hour, which is a total of six hours, which

would not be SGA [substantial gainful activity]." (Tr. at 641)  Thus, it appears that the VE's

statement was based on the understanding that Dr. Mark found Jacquet unable to sit, stand and

walk for a combined total of at least eight hours in a work day, and that the VE was suggesting

that Jacquet's inability to do so would prevent her from performing the type of sedentary

occupation at issue.

　　　However, as the Commissioner notes, (D.I. 19 at 30-31), the VE's answer appears to

have been based on a misreading of Dr. Mark's opinion.  A review of that opinion makes clear

that the VE was looking at Dr. Mark's conclusion as to how long Jacquet could sit, stand and

walk *at one time without interruption*, not how she could perform a combination of these

functions over an eight-hour work day. (Tr. at 442)  Indeed, Dr. Mark opined that in *total* in an

eight-hour work day, Jacquet could sit for up to eight hours, stand for up to two hours and walk

for up to two hours.  (*Id.*)[17]  In light of the VE's misreading of the import of Dr. Mark's opinion,

the Court sees nothing irreconcilable between the ALJ's conclusion and the VE's testimony.

　　　The other problem Jacquet cites with respect to the ALJ's treatment of Dr. Mark's

opinion is that when the ALJ explained why she did not credit Dr. Mark's manipulative

limitation findings, the ALJ cited only to Jacquet's hearing testimony. (D.I. 14 at 19)  As to

manipulative limitations, Dr. Mark concluded that Jacquet could frequently handle and do all

---

[17]　　In her reply brief, Jacquet does not respond to this counter-argument by the
Commissioner.  (D.I. 21 at 8-9)

reaching besides overhead reaching; that she could occasionally reach overhead, finger, and push/pull; and never feel. (Tr. at 443) Jacquet argues that her hearing testimony did not conflict with Dr. Mark's opinion as to manipulative limitations, and, if anything, it bolstered that opinion. (D.I. 14 at 19-20)

Here the Court agrees with the Commissioner, (D.I. 19 at 30), that this asserted error could not justify remand, as it could not have impacted the ALJ's disability determination. This is because the DOT's listing for "surveillance-system monitor" holds that, *inter alia*, reaching, handling, fingering, and feeling are all "not present" in this occupation. DICOT No. 379.367-010, 1991 WL 673244 (4th ed. 1991) (surveillance-system monitor); *see also Lister v. Astrue*, No. 3-10-CV-I436-BD, 2011 WL 4424390, at *4 (N.D. Tex. Sept. 22, 2011). Thus, as the ALJ noted in her second decision, the job cited by the VE as within Jacquet's capabilities is "consistent with [] Dr. Mark's [manipulative] limitations[.]" (Tr. at 569) Even if the ALJ had erred in assigning little weight to Dr. Mark's manipulative limitations due to the nature of Jacquet's testimony, such error would have been harmless.[18]

### b.    Dr. Allen's Opinion

Jacquet also argues that the ALJ erred in rejecting Dr. Allen's conclusion that Jacquet

---

[18]      It is not, in fact, clear that the ALJ did err here, as Jacquet's testimony at the first hearing established that she could do all of the following on an average day: button a blouse, zip up a jacket, pick up a coin from a table (with a little difficulty), grip a knife and fork, hold a toothbrush, hold a hairbrush (though not for long), use a pen to fill out a grocery list, open up a car door or use a doorknob, and hold a steering wheel. (Tr. at 489-90) The ALJ referred to just this testimony when she concluded in her second decision that the "claimant's testimony reflects that she can perform basic manipulative functions." (Tr. at 569; *see also* Tr. at 564-65 (ALJ also concluding, citing back to the above portion of Jacquet's testimony, that "[a]lthough she experiences some numbness and discomfort in her hands, she is able to perform most manipulative activities as reflected in her testimony."))

could not perform sedentary work unless she were off of pain medication, noting that the
opinion was consistent in this regard with those of Dr. Mann (a treating physician), Dr. Chicko
(a treating podiatrist) and Ms. Songui (a vocational counselor who personally worked with
Jacquet). (D.I. 14 at 20-21) The ALJ afforded some weight to portions of Dr. Allen's opinion,
but failed to credit the portion relating to Jacquet's inability to perform sedentary work while on
medication. (Tr. at 570) The ALJ did so because Dr. Allen: (1) had never examined Jacquet as
so was "unaware of how her narcotic pain medication is affecting her ability to perform
sustained work activities"; (2) did not have a specialization in vocational rehabilitation that
would allow him to opine in this area as the VE had. (*Id.*) The ALJ further explained that she
had assigned simple, unskilled sedentary work in the hypothetical provided to the VE
"specifically to address the affects of the claimant's medication side effects[.]" (*Id.*)

"It is well established that a non-examining physician's opinions 'have less probative
force as a general matter, than they would have if the doctor had treated or examined [the
claimant].'" *Williams v. Astrue*, 317 F. App'x 212, 215 (3d Cir. 2009) (quoting *Morales v.
Apfel*, 225 F.3d 310, 320 (3d Cir. 2000)). Because non-examining sources have no examining
or treating relationship with the claimant, the weight given to their opinion depends on the
extent to which the source provides supporting explanation for the opinion. *Id*; 20 C.F.R. §
416.927(c)(3). Where a treating physician's opinion conflicts with that of a non-treating,
non-examining physician, an ALJ may choose whom to credit but cannot reject evidence for no
reason or for the wrong reason. *Morales*, 225 F.3d at 317 (internal quotation marks and citation
omitted). When rejecting evidence, the ALJ "must give some indication of the evidence which
he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121.

Here, Dr. Allen, who was neither a treating nor examining source, cited little in the way of supporting explanation for his opinions. His opinions were not supported by a lengthy written evaluation, they cited to no other supporting medical records or opinions, and they consisted solely of a few lines of handwritten text on two Division of Vocational Rehabilitation forms. (Tr. at 411-12)

More significantly, to the extent that they indicated that Jacquet must be "off of narcotics" before participating in a "sedentary job[,]" (Tr. at 412), Dr. Allen's opinions conflicted with at least that of Dr. Islam, Jacquet's treating neurologist, who had treated Jacquet for years. (Tr. at 571) Jacquet had presented Dr. Islam with the full range of her foot, knee and back pain from 2004 to 2006, over a large number of visits. Yet Dr. Islam repeatedly noted her conclusion in medical records from that time period that Jacquet could, in fact, perform sedentary work—even during periods when Jacquet was prescribed significant medication—so long as Jacquet did not remain on her feet for long periods. (Tr. at 307, 310, 384, 388, 391-92, 409-10) In fact, throughout the relevant time period, Dr. Islam was persistent in repeatedly referring Jacquet to vocational training for this purpose, including specific referrals that Jacquet participate in computer training classes or classes in retail management in 2006. (*Id.*)[19] The fact

---

[19]     As noted above, Jacquet cites to the opinions of Dr. Mann, Dr. Chicko and Ms. Songui as those contrary to the ALJ's conclusion here. As to Dr. Mann, he did not elaborate much on the basis for his opinion as to the effects of medication on Jacquet's ability to work, writing only in a short, April 3, 2007 note that Jacquet "is unable to work full time due to the effects of chronic pain medication." (Tr. at 438) The ALJ was permitted to side with the view of Jacquet's treating neurologist (Dr. Islam) over that of her general practitioner (Dr. Mann), and did just that here. (Tr. at 569-70) As to Dr. Chicko, his statement that Jacquet was not "able to perform her duties at work at a proper level" was made in October 2004, barely a month after Jacquet stopped her work as a cook supervisor at the outset of the claimed period of disability. (Tr. at 195) The context and wording of that statement strongly suggest that the opinion was particularly focused on the demands of that particular job—and was not a broader conclusion that

that Jacquet's treating neurologist believed that she could perform sedentary work while taking medication—an opinion the ALJ clearly relied on coming to a conclusion different from Dr. Allen's—amounts to substantial evidence supporting the ALJ's decision to give Dr. Allen's contrary opinion on this point no weight. (Tr. at 570-71); *see also* 20 C.F.R. § 404.1527(c)(2) (noting that opinions of treating sources are generally given "more weight" than those of non-treating sources).[20]

### c. The ALJ Did Not Reject Medical Evidence Based on Her Lay Opinion

Jacquet's final argument is that the ALJ first determined Jacquet's RFC "by herself[,]" and then compared the medical opinions to her lay determination, impermissibly rejecting any opinions not consistent with her own. (D.I. 14 at 21) As the above analysis indicates, however, that is not a fair criticism of the ALJ's actions. To the contrary, the ALJ cited to the opinions of both treating and non-treating physicians such as Dr. Islam, Dr. DuShuttle, Dr. Borek, and Dr. Keyes as supporting evidence giving rise to her conclusions as to these disputed areas of the record. (Tr. at 569-71) To be sure, those opinions conflicted at times with the opinions of other treating and non-treating physicians. But when they did, the ALJ grounded her reasons for failing to credit these contrary opinions in citations to the medical evidence or to other relevant

---

Jacquet could never perform any type of work. (*Id.*) Indeed, Dr. Chicko went on to note that as to Jacquet's use of Neurontin (the drug that was having an effect on her work as a cook and supervisor, and one she would later discontinue), often "patients will become more accustomed to [the drug] and the lightheadedness and blurry vision may pass." (*Id.*) Finally, as to Ms. Songui's opinion, (Tr. at 133), the ALJ noted that under Social Security Regulations, Ms. Songui, a vocational rehabilitation counselor, is not considered an "acceptable medical source[,]" and determined not to credit Ms. Songui's opinion to the extent it was in conflict with that of treating physicians like Dr. Islam. (*Id.* at 570)

[20]     Indeed, Dr. Borek, a state agency physician reviewing the record in 2005 came to the same conclusion, citing to Dr. Islam's treating opinion for support. (Tr. at 230)

evidence. (*Id.*) For these reasons, the Court cannot find that the ALJ impermissibly relied on her own lay opinion in reaching the conclusions that she did.

## IV.    CONCLUSION

For the reasons set forth above, the Court recommends that Jacquet's motion for summary judgment be GRANTED-IN-PART and DENIED-IN-PART, and that the Commissioner's motion for summary judgment be DENIED. The Court further recommends that the case be remanded for further proceedings, solely so that the ALJ may again review the evidence and set forth in detail the written reasons supporting a determination that Jacquet's diabetes mellitus with neuropathy either did or did not demonstrate that Jacquet met the requirements of Listing 9.08A.

Dated:  December 1, 2013

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE